Michael L. Tuchin (State Bar No. 150375)
mtuchin@ktbslaw.com
Samuel M. Kidder (State Bar No. 284015)
skidder@ktbslaw.com
Eitan Arom (State Bar No. 342703)
earom@ktbslaw.com
KTBS LAW LLP
1801 Century Park East, 26th Floor
Los Angeles, California 90067
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090

*Counsel for Rachel Gindi
as Trustee of the JRG Trust # 219*

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>CARE FOR THE ELDERLY, INC.,<br><br>    Debtor and Debtor in Possession. | Case No. 2:26-bk-10221-BR<br><br>Chapter 11<br><br>**NOTICE OF MOTION AND MOTION FOR REMOVAL OF THE DEBTOR IN POSSESSION UNDER 11 U.S.C. § 1185; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**<u>Hearing Date:</u>**<br>Judge:    Hon. Barry Russell<br>Date:     June 9, 2026<br>Time:     10:00 a.m.<br>Place:    Courtroom 1668<br>          255 East Temple Street<br>          Los Angeles, CA 90012 |

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND ALL OTHER PARTIES ENTITLED TO NOTICE:**

**PLEASE TAKE NOTICE** that Rachel Gindi, in her capacity as Trustee of the JRG Trust # 219 (the "Gindi Trust"), hereby moves this Court (the "Motion") for entry of an order, substantially in the form of **Exhibit 1** hereto, removing Care for the Elderly, Inc. (the "Debtor") as debtor in possession under 11 U.S.C. § 1185(a), authorizing Gregory K. Jones ("Mr. Jones" or the "Trustee") to operate and administer the estate, and authorizing and directing the Trustee to select a manager for the Debtor's skilled nursing facility acceptable to the California Department of Public Health. This Motion is supported by these moving papers, the memorandum of points and authorities annexed hereto, the Declaration of Samuel M. Kidder ("Kidder Declaration"), the Declaration of Alan J. Gindi ("Gindi Declaration"), the Declaration of Daniel J. Taylor ("Taylor Declaration"), the arguments and representations of counsel at the hearing on the Motion, and the record in this chapter 11 case.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on June 9, 2026 at 10:00 a.m. before the Honorable Barry Russell, United States Bankruptcy Judge for the Central District of California, in Courtroom 1668 at 255 E. Temple St., Los Angeles, CA 90012.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), any response to the Motion must (1) be in writing and include all reasons and evidence in support of the opposition and (2) be filed with the Court and served upon the United States Trustee, counsel for the Gindi Trust, and counsel for the Debtor no later than **fourteen (14) days** before the date designated for hearing. Pursuant to Local Bankruptcy Rule 9013-1(h), the Court may deem the failure of any party to timely file and serve an objection to the Motion to constitute consent to the relief requested.

**WHEREFORE**, the Gindi Trust respectfully requests that the Court enter an order granting the Motion and granting such other and further relief as the Court deems just and proper.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

May 19, 2026                          KTBS LAW LLP

                                        _____/s/ Samuel M. Kidder_____
                                     Michael L. Tuchin (State Bar No. 150375)
                                     Samuel M. Kidder (State Bar No. 284015)
                                     Eitan Arom (State Bar No. 342703)

                                     *Counsel for Rachel Gindi, as Trustee of the JRG Trust # 219*

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

ii

# TABLE OF CONTENTS

**Page**

II. INTRODUCTION .................................................................................................................1

III. BACKGROUND...............................................................................................................3

    A.    The Debtor refuses to vacate the Facility after the Lease expires, and the Gindi Trust files the Unlawful Detainer Action..........................................................4

    B.    As the Unlawful Detainer Action proceeds, the Debtor transfers millions to insiders ........................................................................................................................5

    C.    Insiders bring the Debtor to the point of cash-flow insolvency and saddle it with debt...................................................................................................................7

    D.    Schmukler files a $10 million lien against the estate ................................................8

    E.    The Debtor files its petition extolling the need for chapter 11 protections...............9

    F.    The Debtor's exorbitant postpetition insider compensation scheme .......................10

    G.    The Debtor proves inept and untrustworthy at managing the estate ........................11

    H.    The Debtor's insiders face setbacks and decide to abandon chapter 11 .................14

IV. ARGUMENT.....................................................................................................................16

    A.    The Debtor suffers a lack of leadership and a disregard for the bankruptcy process....................................................................................................................17

    B.    The Debtor's insiders are hopelessly conflicted ......................................................19

    C.    The Debtor has no plan for "Day One" after the unlawful detainer trial ................22

V. CONCLUSION ...................................................................................................................24

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Duling Sons, Inc.*,
650 B.R. 578, 581 (Bankr. D. S.D. 2023) ..................................................................................20

*Green v. Nosek*,
2022 WL 16857106 (D. Minn. Nov. 10, 2022) ..........................................................................16

*In re Micron Devices*, *LLC*,
2021 WL 2021468 (Bankr. S.D. Fla. May 20, 2021) .................................................................16

*In re No Rust Rebar, Inc.*,
641 B.R. 412 (Bankr. S.D. Fla. 2022) .......................................................................................19

*In re Picacho Hills Utility Co.*,
518 B.R. 75 (Bankr. D.N.M. 2014) ......................................................................................19, 20

*In re Pinnacle Foods of California LLC*,
2025 WL 951650 (Bankr. E.D. Cal. Mar. 27, 2025)........................................................16, 19, 22

*In re Pittner*,
638 B.R. 255 (Bankr. D. Mass. 2022) .......................................................................................16

**Statutes**

11 U.S.C. § 363 ...............................................................................................................................16

11 U.S.C. § 365 ...............................................................................................................................16

11 U.S.C. § 503 ...............................................................................................................................11

11 U.S.C. § 547 ................................................................................................................15, 18, 21

11 U.S.C. § 1185 ..........................................................................................................3, 16, 25

11 U.S.C. § 1189 .............................................................................................................................15

Cal. Corp. Code 500 ........................................................................................................................20

Cal. Corp. Code 501 ..................................................................................................................5, 20

**Other Authorities**

Collier on Bankruptcy (16th ed. 2026)............................................................................................16

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### I. INTRODUCTION

1. When the Debtor filed for bankruptcy, it told the Court that it needed the protections of chapter 11 because of the Gindi Trust's unlawful detainer action (the "Unlawful Detainer Action"), which seeks to recover possession of the skilled nursing facility the Debtor operates (the "Facility"). The Debtor warned that if it loses that action, it would be unable to pay its creditors. To make matters worse, it said that the Facility's administrator, Yehuda Schmukler, has a contingent lien that would kick in if the Debtor lost the unlawful detainer trial, resulting in a $10 million secured claim that would overwhelm the claims pool and severely dilute recoveries for other creditors.

2. None of these circumstances have changed. The Debtor recently reaffirmed that if it loses the trial and Schmukler holds an enforceable claim, the Debtor "would have no way of paying claims against the estate" and "recoveries to general unsecured creditors would be significantly diluted and/or jeopardized." Dkt. 180 at 18, 21. In bankruptcy, the Schmukler lien can plainly be avoided as a preferential transfer, the estate has strong arguments to disallow or avoid his claim altogether, and creditors can share *pro rata* in the Debtor's assets (including valuable avoidance actions against insiders). Outside bankruptcy, the Debtor would be exposed to the Schmukler secured claim, the ability to avoid other prepetition transfers would be lost, and the estate's non-insider creditors would be harmed. Yet, last week, the Debtor moved to dismiss its case, proposing to walk away from bankruptcy and leave its creditors and patients to whatever fate awaits them.[1]

3. There is a simple explanation for this reversal: The Debtor has never been interested in reorganizing, protecting creditors, or safeguarding a patient transition through bankruptcy. Rather, it filed this case to game the bankruptcy system—to stall the Unlawful Detainer Action and allow insiders to continue to extract value from the Debtor's operations until the inevitable turnover of the Facility to a new operator. Before bankruptcy, facing the possibility of losing control over the Facility, it shoveled all of its cash to insiders—including $2.1 million to its owner's son-in-law,

---

[1] The Gindi Trust's deadline to oppose the Debtor's motion to dismiss, Dkt. 181, is May 26, 2026. It plans to file an opposition by that date.

Elliot Zemel, for supposed legal fees—bringing a profitable enterprise to the brink of cash-flow insolvency and crashing into chapter 11 with less than $4,000 in the bank. At the same time, the Debtor allowed unprecedented debts to vendors and state regulators to accumulate in order to free up cash to distribute to insiders. In bankruptcy, the Debtor proposed to continue siphoning cash to insiders, for example, proposing to pay 10% of revenues to Zemel even though he has never before been on the Debtor's payroll. By using the automatic stay to postpone the trial, it sought to keep this insider gravy train going for as long as possible.

4. Since the filing, the Debtor has faced setbacks that make bankruptcy less advantageous than its insiders had hoped. The Court granted the Gindi Trust's stay-relief motion, frustrating the Debtor's desire to postpone trial. The Gindi Trust opposed the Debtor's exorbitant insider-pay proposals, forcing the Debtor to pause its insider pay until after the unlawful detainer trial. Finally, the state court, on its own motion, continued the unlawful detainer trial by four months, to August 3, 2026. Thus, although the Debtor got some of the delay it hoped for, it could not use that delay to enrich its insiders, given its agreement to pause insider pay. Suddenly, exiting bankruptcy appears highly convenient for the Debtor's insiders: Outside this Court's scrutiny, they can extract whatever cash comes in the door and deliver a judgment-proof shell to the courthouse steps. The Debtor's shifting fortunes and desire to escape scrutiny are the sole reasons it now seeks to dismiss its case even though the factors allegedly precipitating the bankruptcy petition still loom on the horizon.

5. If the Court denies the motion to dismiss (as it should), it thus faces a contradiction: The Debtor filed this case saying it needed chapter 11 to protect creditors and patients, but has now reversed course and sworn off the bankruptcy process altogether at the moment those stakeholders most need protection. It has never been more apparent that the Debtor's insiders are not trustworthy fiduciaries and will not use the tools of bankruptcy for the estate's benefit. They will not, for example, challenge Schmukler's extremely suspicious $10 million claim or seek to avoid his preferential lien, pursue avoidance of the millions they transferred to themselves in the months leading up to bankruptcy, or participate in a safe and cooperative transfer of the Facility's operations if the Debtor loses its trial in August. Only a neutral third party will do those things.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

6. Moreover, it is critical that the Debtor be protected from continued exploitation by insiders *before* the unlawful detainer trial. If the Debtor loses that trial (as it evidently expects to, given its eve-of-trial bankruptcy filing), there is no telling what steps its insiders will take to extract whatever value remains in the estate. Given the Debtor's lack of responsible leadership, the Court should not wait for the estate to face a crisis to begin preparing for it. Rather, an independent fiduciary should have an opportunity, before the trial, to prepare the estate's next steps, retain licensed management to ensure continuity of care for patients, and coordinate as necessary with other interested parties, including the patient-care ombudsman, the United States Trustee, and state regulators. In any case, the estate can no longer be left in the care of actors who have definitively shown they will not protect its interests.

7. It is, in short, time for the Court to have a responsible actor answer to it. Fortunately for all parties, there is already such an actor here. Subchapter V provides for a trustee in every small business case to provide oversight of the debtor. Mr. Jones has served in that capacity since the outset of this case. Although a subchapter-V trustee's powers are limited at the outset, section 1185(a) provides a mechanism for the Court to remove the Debtor as debtor in possession and allow the Trustee to administer the estate for the benefit of its stakeholders. Here, the Debtor's total failure of leadership, profound conflicts of interest, and refusal to take steps to safeguard its creditors and patients mandate this remedy.

## II. BACKGROUND

8. In the months before bankruptcy, the Debtor's insiders unjustifiably stripped it of millions of dollars of cash, leaving just $4,000 in the Debtor's bank account. After the filing, they attempted to turn on a new spigot of insider compensation so the Debtor's owner and his son-in-law could siphon off more of the Debtor's cash flow while awaiting trial in the Unlawful Detainer Action. When that effort failed, the Debtor moved to dismiss; if successful, it says it will continue lavishing payments on insiders outside the scrutiny of bankruptcy. The Debtor appears no longer to care that, if it loses the unlawful detainer trial, it will have no ability to pay its debts and face a $10 million secured claim that could wipe out unsecured recoveries. The background of this case

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

thus demonstrates that the Debtor has consistently acted to enrich its insiders and has now affirmatively sworn off any desire to protect creditors and patients.

**A.    The Debtor refuses to vacate the Facility after the Lease expires, and the Gindi Trust files the Unlawful Detainer Action**

9.    The Debtor formerly leased a skilled nursing facility at 2312 W. 8th Street, Los Angeles, CA from the Gindi Trust. *Declaration of Elliot Zemel in Support of First-Day Motions*, Dkt. 9 ("Zemel First-Day Declaration") ¶ 8. The lease expired by its own terms on November 30, 2023. *See* Dkt. 79, Ex. 1 (the "Lease") § 2. The Lease provided for a fixed monthly "Base Rent," plus "Additional Rent" comprising 50% of the Debtor's operating profits, with the same rent structure applicable if the Debtor held over after the term ended. *Id.* §§ 3, 24. At the end of the term, the Debtor must "turn over to Lessor the entire operation of the nursing home intact." *Id.* § 23.

10.    By the time the Lease term came to an end in 2023, the relationship between the Gindi Trust and the Debtor's principals had broken down, and the Gindi Trust decided to seek a new operator for the Facility. Gindi Decl. ¶ 6. The Gindi Trust identified a replacement operator, but the Debtor refused to cooperate with a transition absent payment of $10 million. *Id.* As a result, the replacement operator pulled out of the transaction. *Id.* Despite diligent marketing efforts, the Gindi Trust has not found a buyer on terms equivalent to the first replacement operator. *Id.* But, in order to ensure a safe and expeditious transfer of operations, the Gindi Trust agreed to lease the facility to a regional operator on less favorable terms. *Id.* That operator remains willing to assume management of the Facility. *Id.* The Debtor, however, has so far refused to participate in a consensual transfer to this second new operator. *Id.*

11.    The Debtor's refusal to cooperate left the Gindi Trust with no choice but to serve the Debtor with a 30-day notice to quit, which it did on December 10, 2024. Taylor Decl. ¶ 2. The Gindi Trust filed the Unlawful Detainer Action against the Debtor the following month. *Id.*

12.    The Debtor has not paid Additional Rent since before the Unlawful Detainer Action was filed. Gindi Decl. ¶ 7. Although the Debtor has attempted to pay Base Rent, the Gindi Trust stopped accepting its checks in May 2025 after the Debtor argued that doing so would renew the

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

4

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Debtor's tenancy (and thus defeat the Unlawful Detainer Action). Taylor Decl. ¶ 3. Thus, the Gindi Trust has not received any rent since April 2025.

13. Meanwhile, the Gindi Trust took steps in the Unlawful Detainer Action to ensure that a judgment in its favor would preserve stability and care for patients. Two weeks after filing the action, the Gindi Trust filed an *ex parte* motion to appoint a receiver to manage a safe transition given Debtor's refusal to cooperate. Taylor Decl. ¶ 4. Although the state court denied the *ex parte* motion (without prejudice) as premature, the Gindi Trust coordinated with the California Department of Public Health prebankruptcy to select a receiver with the required skills, experience, and credentials. *Id.*

**B.    As the Unlawful Detainer Action proceeds, the Debtor transfers millions to insiders**

14. Unknown to the Gindi Trust, while the Debtor was defending the Unlawful Detainer Action and paying no rent, it was making exorbitant, unjustifiable transfers to insiders.

15. First, between May and August 2025, the Debtor paid out $2,630,000 in supposed profit distributions to Kohn. Dkt. 87 at 62. Debtor has never provided an accounting to show that Kohn was entitled to these distributions, and the amount of unpaid claims suggests that the distributions violated California law. *See* Cal. Corp. Code § 501 ("Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders . . . if the corporation . . . is, or as a result thereof would be, likely to be unable to meet its liabilities . . . as they mature."). The $2.6 million paid to Kohn in 2025 also were not accompanied by equivalent payments to the Gindi Trust, even though the Gindi Trust would be entitled to an equal profit share under the Lease. In addition, in its motion to dismiss, the Debtor has proposed that Kohn "return" half of the payments ($1.3 million), comprising 50% of the profits. Dkt. 181 at 30. The Debtor thus seems to acknowledge that Kohn improperly distributed to himself the profits from the Facility even though the Lease would have entitled the Gindi Trust to half of those amounts.

16. Next, on October 16, 2025 (*i.e.*, 87 days before the bankruptcy) Zemel registered "LKH Legal Services" as a fictitious name for Himel Capital LLC, a business he claims to own. Kidder Decl. Ex. B. The Debtor then began to make payments to the newly minted LKH Legal

5

Services ("LKH").  The Debtor says it paid Zemel at least $2,132,650 between October and December 2025.  Dkt. 87 at 62–63.

17.    Zemel's description of these payments makes clear that they were highly irregular. According to Zemel, even though he had never before been paid for his services to the Debtor, the Debtor made these eve-of-bankruptcy payments in exchange for past legal services rendered between 2023 and 2025.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 49:19–50:15.  Although Zemel had worked in an "amorphous role" for the Debtor before 2023, he said he performed these services for free due to his "great debt of gratitude" to Kohn as his father-in-law and mentor.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 13:15–16, 52:3–8.  Nevertheless, at some point (Zemel has not said exactly when), he had a discussion with Kohn, during which "we agreed that the amount of work and time that I was putting in warranted compensation, and so we agreed on an amount." *Id.* at 50:16–24.  Zemel has also admitted that he did not keep contemporaneous records of his hours; instead, he wrote them down later on a notepad, but no longer has the notepad in his possession. Taylor Decl. Ex. F at 47:24–48:23.

18.    Lastly, within 60 days of the bankruptcy, the Debtor paid Schmukler more than $1.2 million in bonus compensation.  Dkt. 87 at 43–57.  That comprised only part of Schmukler's 2025 pay; Zemel testified that, even though he is supposedly in charge of the Debtor's finances, he could not say how much in total Schmukler was paid in 2025, but the amount might have exceeded $5 million.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 29:13–30:2.  The Debtor also has not said why Schmukler was paid more than $1 million in bonuses during this period; Schmukler's contract says that his bonuses "shall be payable . . . concurrently with the payment of any percentage rent . . . actually paid," Dkt. 122 at 15, and Additional Rent has not been paid since December 2024.[2]

---

[2]    In the year before bankruptcy, the Debtor also made $166,800 in supposed "charitable contributions" to schools that Schmukler's children attend.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 22:4–19; Dkt. 87 at 35.  In addition, the Debtor made a $100,000 donation to a synagogue that it has not been able to explain, given that Zemel testified none of its principals are affiliated with or attend that synagogue.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 21:7–24; Dkt. 87 at 35.

KTBS Law LLP
1801 Century Park East, Twenty-Sixth Floor
Los Angeles, California 90067
Telephone: 310-407-4000

**C.    Insiders bring the Debtor to the point of cash-flow insolvency and saddle it with debt**

19.    The payments to the Debtor's insiders—totaling more than $6 million between May 2025 and January 2026—brought the Debtor to the precipice of cash-flow insolvency. Even though the Debtor boasts of "a highly profitable business," Zemel First-Day Decl. ¶ 35, by January, Zemel testified, "there was not enough money in [its] account," and the Debtor was required to take an alleged $500,000 loan from Kohn on January 6, 2026. 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 33:9–20. The Debtor never documented this loan in writing. *Id.* at 36:2–6. Two days later, the Debtor made payroll payments of $553,235.91, Dkt. 87 at 43—meaning that *had Kohn not returned $500,000 of the amounts the insiders extracted from the Debtor, the Debtor would not have been able to pay its employees*.

20.    Even with this infusion, the Debtor, which collected more than $30 million in revenue last year, had **less than $4,000 in its bank account** when it filed its chapter 11 petition on January 11, 2026. Dkt. 87 at 3.

21.    During this same period—while insiders were receiving millions and the Debtor was paying no rent—the Debtor was saddling itself with unpaid bills, including to state regulators. By the petition date, it owed nearly $700,000 to the California Department of Health Care Services for quality-assurance fees and nearly $800,000 to a provider of rehabilitation services. Dkt. 87 at 16, 18. Zemel testified that the Debtor typically paid these bills "pretty regularly, monthly or every other month," but he "was busy with other things, legal matters" and allowed the payments "to slip through the cracks" for six months leading up to the bankruptcy. 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 40:10–42:22.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

7

| Timeline of Debtor financial events prebankruptcy | |
| --- | --- |
| December 10, 2024 | The Gindi Trust serves a notice to quit and the Debtor stops paying Additional Rent |
| January 10, 2025 | Gindi Trust files the Unlawful Detainer Action |
| May 2025 | The Gindi Trust stops accepting Base Rent after the Debtor argues doing so defeats the Unlawful Detainer Action |
| May – August 2025 | Debtor transfers **$2.6 million to Kohn** |
| October 16, 2025 | Zemel registers LKH; the Debtor proceeds over the next two months to transfer **$2.1 million to LKH** (*i.e.*, Zemel) for alleged legal fees with no contemporaneous records of hours billed |
| November – December 2025 | Debtor transfers **$1.2 million to Schmukler** |
| December 9, 2025 | Schmukler files a UCC-1 based on a purported $10 million contingent lien against the estate, which was allegedly granted in 2020 (*see* Section II.D, *infra*) |
| January 6, 2026 | Debtor takes **$500,000 "loan" from Kohn** because there is "not enough money in [its] account" to pay bills |
| January 8, 2026 | Debtor makes a **$553,235.91 payroll transfer** that it could not have made without Kohn's "loan" |
| January 11, 2026 | Debtor files its petition with **less than $4,000** in its bank account and **owing hundreds of thousands of dollars** in unprecedented debts to vendors and state regulators |
| January 12, 2026 | Previously scheduled trial date in the Unlawful Detainer Action |

**D.    Schmukler files a $10 million lien against the estate**

22.    The Debtor's insiders executed one final maneuver to further their bankruptcy gamesmanship before the petition date. On December 9, 2025—approximately one month before the bankruptcy—Schmukler filed a UCC-1 purporting to reflect a lien against "[a]ll current and future receivables and current and future bank accounts" of the Debtor. *See* Claim No. 19-1 at 5.

23.    The circumstances of Schmukler's purported security agreement are unclear, to say the least. The Debtor claims that, in 2020, it signed an agreement with Schmukler granting him a ***$10 million secured severance package*** in the event the Lease was terminated. Dkt. 13 ¶ 11. Debtor has provided scant details of this agreement, and the facts it has provided are extremely suspicious. For example, even though the Debtor stresses that the Gindi Trust was closely involved with Schmukler's hire in 2012, *e.g.*, Zemel First-Day Decl. ¶¶ 25–28, and Debtor has relied on

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

8

Schmukler's original agreement to assert reliance on a supposed promise to extend the lease to 2033, Debtor never told the Gindi Trust (or anyone else) about the severance agreement until the bankruptcy. 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 31:7–13. Unlike the 2012 employment agreement, which was a 14-page agreement extensively negotiated by lawyers, the 2020 amendment was a one-page, homespun document allegedly negotiated solely among Kohn, Zemel, and Schmukler without counsel. *Id.*; Dkt. 122 at 66. And even though the deal was allegedly struck in 2020, Schmukler only recorded his lien one month before the bankruptcy. *See* Claim No. 19-1 at 5.

24. The deal's mechanics are also unclear. For example, the purported consideration on Schmukler's part is that he agreed to "waive his annual incentive bonuses *to the extent necessary* to enable CFTE to distribute to Barry Kohn one million dollars." Dkt. 122 at 66 (emphasis added). But the Debtor has never said if any such distributions were actually made—*i.e.* whether Schmukler actually gave any consideration—or why, given Debtor's profitable business, this waiver was even necessary. Nor has the Debtor provided any evidence of any distributions to Kohn under the agreement. The Debtor has also contradicted itself by repeatedly saying Schmukler made a "cash investment" in exchange for the 2020 amendment, Dkt. 122 at 13,[3] even though the agreement mentions no such payment. Despite the suspicious circumstances, Debtor has never produced any evidence that the agreement was actually signed in 2020 (as opposed to being drafted on the eve of bankruptcy and backdated), such as email communications or records of any "cash investment."

**E.     The Debtor files its petition extolling the need for chapter 11 protections**

25. The Debtor filed its petition on January 11, 2026. It portrayed the bankruptcy as existential, saying it "filed this bankruptcy case to maintain the status quo and ensure that operations at the Facility would remain uninterrupted by the Alleged Lessor's efforts to evict the Debtor," which, it said, would "jeopardize . . . the health and well-being of the Debtor's patients . . . [and] the

---

[3]     *See also* Dkt. 13 at 5–6 (cash collateral motion, stating that the 2020 amendment was made "in exchange for Mr. Schmukler's cash investment in the Debtor"); 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 31:14–16 (responding "Yes" when asked "And did Mr. Schmukler invest the $1 million in cash?").

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

Debtor's ability to pay its debts." Zemel First-Day Decl. ¶ 37.  If the Gindi Trust prevailed in state court, "[a] successful reorganization would be impossible." Dkt. 55 ¶ 13 (adversary complaint).

26.     As for the Schmukler claim, the Debtor said that if it loses the Unlawful Detainer Action, the loss could "potentially trigger a $10mm contingent liability effectively devastating the estate." Dkt. 78 at 3 (stay-relief opposition).  The Debtor promised to use the bankruptcy as a platform to avoid Schmukler's lien as a voidable preference. Zemel First-Day Decl. ¶ 16.

**F.      The Debtor's exorbitant postpetition insider compensation scheme**

27.     Almost immediately after the filing, the Debtor took steps to continue diverting millions to Zemel, Kohn, and Schmukler.  In addition, even though Schmukler's claim sets him on a $10 million collision course with the Debtor, the Debtor has gone out of its way to advocate for his interests.

28.     ***First***, on January 22, 2026, the Debtor served Notices of Setting/Increasing Insider Compensation indicating it intended to double Kohn's salary and pay Zemel ***10% of gross revenue*** for his role as the estate's authorized representative.  Dkt. 120 at 6, 19.  Based on 2025 revenue, Zemel's pay would be approximately $3 million per year (*i.e.*, approximately the amount of the entire scheduled claims pool). Dkt. 87 at 32.  Zemel has admitted that, apart from working for the Debtor and drawing a $3 million paycheck, he would continue to work approximately ***60 hours a week for other business endeavors***.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 44:5–46:20, 48:11–14.  The Debtor also has not explained why it was necessary to retain Zemel to oversee the Debtor's business given that Schmukler has testified in other litigation that he, and not Zemel, is "ultimately responsible for all of the facility's operations." Kidder Decl. Ex. C at 15.

29.     ***Second***, on March 10, 2026, the Debtor filed a motion seeking authority to pay Schmukler so-called "Incentive Bonuses," but without detailing how much it intended to pay or when. Dkt. 122.  It also did not explain why Schmukler was entitled to ***any*** bonuses given that his employment contract provides that his bonuses are payable only when the Gindi Trust receives percentage rent, *id.* at 15—which has not happened since December 2024.

30.     In addition to seeking to pay Schmukler bonuses he is not currently entitled to, the Debtor has assisted Schmukler by arguing that he is not an insider.  *E.g.*, Dkt. 38 n.3, Dkt. 122

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

at 22–26 (extensive discussion and conclusory statements regarding insider status).  If Schmukler is an insider, his alleged $10 million severance claim must be disallowed under Bankruptcy Code section 503(c)(2), which bars most insider severance claims.  Thus, by arguing that Schmukler is not an insider, the Debtor has effectively been advocating on his behalf, to the extreme detriment of its other creditors.[4]

31.     Underlying the Debtor's extraordinary advocacy for Schmukler is his close relationship with Zemel and Kohn.  Over time, Zemel and Schmukler became involved together in at least three additional facilities *apart from the Debtor*, which Zemel testified currently earn him approximately ***$4.2 million annually***.  *Id.* at 44:5–47:22, 53:15–17.  The two consider one another friends.  *Id.* at 53:18–19.  As for Kohn, Schmukler has testified that the two had "a close working relationship . . . , and we operated on a basis of mutual trust," such that Schmukler "did not feel the need to verify the execution of" key documents with respect to Kohn.  Kidder Decl. Ex. D ¶ 9.

**G.      The Debtor proves inept and untrustworthy at managing the estate**

32.     The Debtor's operations and disclosures have included a number of irregularities.  To begin with, the Debtor failed to schedule the $500,000 insider loan it had apparently taken from Kohn.  341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 36:4–37:11.  The Debtor also failed to include Kohn's salary payments of approximately $135,000 per year in its list of pre-bankruptcy transfers to insiders.  *Id.* at 14:22–15:5.  After the Gindi Trust questioned the Debtor about these omissions, the Debtor amended its schedules to include them.  Dkt. 99.

33.     Even after they were amended, the Debtor's disclosures have not added up.  For example, the Debtor includes a table of payments to LKH that show that it paid Zemel's shell company more than $900,000 on October 22–23, 2025, but these payments do not appear on its list of transfers within 90 days of the bankruptcy.  Dkt. 99 at 41, 44.  These discrepancies make it

---

[4]     The Schmukler severance claim is likely also unenforceable because, *inter alia*, it is an unenforceable penalty and based on mutual mistake with respect to the Lease term extending to 2033.  The Debtor's incurrence of the contingent $10 million obligation to Schmukler also bears numerous "badges of fraud" and may be avoidable as an actual-intent fraudulent transfer.  The Debtor appears uninterested in exploring any of these approaches.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

impossible to determine how much and when Zemel was actually paid and call into question whether other transfers were omitted from the Debtor's disclosures.

34. In addition, the Debtor recently disclosed that it has apparently been making payments to prepetition unsecured creditors without Court authorization or approval. Its motion to dismiss included a chart of "Proposed Distributions" that listed a number of prepetition, unsecured claims that it says were "satisfied" after the petition date, apparently by payment in full. Dkt. 181 Ex. 1. Among these claims paid without authorization was a $19,000 debt allegedly owed to Schmukler's nephew, Efraim Schmukler, who works at the facility. *Id.* at 26; 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 23:2–15.

35. Finally, in depositions given in the Unlawful Detainer Action since the petition date, the Debtor's insiders have demonstrated extreme ignorance and confusion about the Debtor's governance and operations and their own roles within that structure.[5]

36. First, Kohn, the Debtor's president and supposed sole shareholder, testified that he did not know who the Debtor's directors were and whether it kept board minutes; he also said he had "no idea" about how much operating profit the Debtor made in 2025. Taylor Decl. Ex. E at 15:5–21, 31:21–23. Kohn also testified that he was a joint shareholder with his wife, *id.* at 16:5–10, even though the Debtor has repeatedly claimed that it "is 100% owned by Barry Kohn." *E.g.*, Dkt. 181 ¶ 5. Kohn said he could not remember authorizing the prepetition payments to Zemel or whether Zemel tendered invoices; he also could not remember when Zemel started working for the Debtor and said that Zemel's job duties were to "[d]o what I want." Taylor Decl. Ex. E at 35:5–19; 117:19–118:24. As for the $2.6 million in distributions Kohn received in the months before the bankruptcy, Kohn said he did not remember receiving the payments. *Id.* at 32:9–33:11.

37. Zemel also claimed ignorance about the Debtor's affairs and governance. Like Kohn, Zemel could not say who the Debtor's directors were or if the board kept minutes. Taylor Decl. Ex. F at 27:18–28:13. He could not recall when (or in some cases if) he occupied certain roles

---

[5] Certified transcripts of the Kohn, Zemel, and Schmukler depositions are provided as Exhibits E, F, and G, respectively, to the Taylor Declaration.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

for the Debtor. *Id.* at 16:3–5; 22:20–23:8. He could not describe the types of records the Debtor keeps electronically or in hard copy. *Id.* at 123:20–24. Though he has been the Debtor's sometime CFO, he had to "guess" who prepares its financial statements—not him but his mother-in-law, Toby Kohn—and where they are located. *Id.* at 12:7–25.[6] Zemel said he did not know why Kohn was paid $2.6 million in the months before the bankruptcy and was "not sure" if these were profit distributions, Taylor Decl. Ex. F at 40:13–23, even though he testified unequivocally at the section 341(a) meeting a few weeks earlier that these were "profit distributions." 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 14:20–21. He admitted he had no evidence reflecting his own payments and said he did not keep contemporaneous records of the hours he billed (instead tallying them after-the-fact on a notepad, which he no longer has). Taylor Decl. Ex. F at 10:1–24, 47:5–48:23.

38.    Lastly, Schmukler expressed a similar confusion at his deposition. Although he is the Facility's administrator, he could not say what type of records the Debtor keeps or where. *Id.* at 27:22–30:9. Despite having testified under oath in earlier litigation against the Debtor that he was "ultimately responsible for all of the facility's operations," Kidder Decl. Ex. C at 15, he now directly contradicted that testimony. Taylor Decl. Ex. G at 61:8–10 ("Q: Are you ultimately responsible for all the facility's operations? A: No.").

39.    In the past, Zemel and the Debtor have also displayed confusion about Schmukler's role. Contrary to Schmukler's past testimony, Zemel, at the section 341(a) meeting, took the position that Schmukler *did not* have ultimate responsibility for the facility. 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 25:9–13 ("Q [I]s it fair to say that [Schmukler] was ultimately responsible for the facilities [*sic*] operations? [Zemel:] No."). The Debtor has also led the Court to believe that Schmukler was its "Assistant Administrator" as of the bankruptcy filing. Dkt. 38 n.3. Only after Debtor's authorized representative admitted at the section 341(a) meeting that Schmukler was "***the*** administrator," 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 10:25 (emphasis added), did Debtor begin

---

[6]    Indeed, Kohn testified that Mrs. Kohn acts as the unpaid bookkeeper and controller for the Debtor, further calling into question the need to pay Zemel millions of dollars before and during the bankruptcy case. Taylor Decl. Ex. E at 48:11–49:10.

13

saying that Schmukler had been promoted to that job in 2021, Dkt. 122 at 3. These contradictions and evasions have provided little clarity regarding Schmukler's role—a key issue given his purported $10 million severance package and the dispute over his insider status.

**H.     The Debtor's insiders face setbacks and decide to abandon chapter 11**

40.     The Debtor's insiders faced two key setbacks in the bankruptcy case that precipitated their decision to attempt to dismiss the case.

41.     *First*, the Gindi Trust filed a stay-relief motion seeking to take the Unlawful Detainer Action to trial in the state court. Dkt. 40. The Debtor opposed stay relief, claiming it preferred to litigate issues in the Bankruptcy Court, Dkt. 78, and filed a complaint that sought to litigate the status of the Lease in an adversary proceeding, Dkt. 55. It admitted that its preference for Bankruptcy Court adjudication was related to its perception that this Court would be more favorable to its plight. 2/17/2026 Hr'g Tr. at 22:3–10 (statement of Debtor's counsel that, in litigating the Lease, "the Court should balance the prejudice to the Debtor as compared to the prejudice to the landlord" which "the State Court cannot do"). The Court, in the Debtor's words, was "not persuaded," Dkt. 181 at 3, and granted stay relief, Dkt. 106.

42.     *Second*, the Gindi Trust opposed the Debtor's proposal to funnel cash to Zemel and double Kohn's salary and its motion to pay unspecified millions in bonuses to Schmukler. Dkt. 120, 139. Rather than litigate these issues, the Debtor agreed with the Gindi Trust to postpone any adjudication on insider compensation until after the unlawful detainer trial, with insider payments, including Schmukler's bonuses, paused in the meanwhile. Dkt. 146.

43.     When the parties appeared before the state court in the Unlawful Detainer Action on April 13, 2026, the anticipated trial date, the Court reset the trial to begin on August 3, citing the press of other court business. Taylor Decl. ¶ 5. As a result, under its stipulation with the Gindi Trust, the Debtor must wait until after that (if ever) to continue distributing cash to insiders.

44.     The Debtor evidently was not content to wait. On May 12, 2026, it filed a motion to dismiss the bankruptcy case. Dkt. 181. The Debtor admits that the circumstances that led it to file bankruptcy in the first place persist. It acknowledges that a Gindi Trust victory in the Unlawful Detainer Action would result in an "inability of the Debtor to pay its debts." *Id.* ¶ 8; Dkt. 180

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

14

(subchapter-V plan) at 18 ("Absent the Debtor's ability to operate the Facility Business, the Debtor would have no way of paying claims against the estate . . . ."). And the Debtor does not dispute that the purported Schmukler claim remains an active threat, saying that if this claim can be enforced against the estate, "recoveries to general unsecured creditors would be significantly diluted and/or jeopardized." Dkt. 180 at 21. Yet even though the unlawful detainer trial is now less than three months away, and dismissing the bankruptcy would waive the Debtor's ability to avoid Schmukler's lien under section 547, the Debtor nevertheless "submits that no further purpose or benefit would be served by remaining in Chapter 11." Dkt. 181 at 12.

45.    Importantly, the Debtor does not propose to pay *all* its creditors as a condition of dismissal. Instead, it would use its approximately $4,000,000 in "Available Cash" to pay "***undisputed, liquidated claims* in full**" and "allow claimants with unliquidated claims to proceed with liquidating their claims against the Debtor pursuant to applicable nonbankruptcy law." Dkt. 181 at 11–12 (emphasis added). Thus, certain debts that the Debtor happens not to dispute— like the $500,000 unwritten Kohn insider loan—would be paid in full, while others would be paid partly or not at all. For example, the Debtor faces elder-abuse and related tort claims (Claim No. 3-1), hundreds of thousands of dollars in claims related to a wage-and-hour class action (Claim Nos. 14-1–18-1), and unpaid bills for legal fees (Claim No. 5-1) and radiology and laboratory services (Claim No. 1-1)—all of which the Debtor has labeled as "Disputed/unsubstantiated" and therefore proposes to value at $0 in connection with its "structured" dismissal. Dkt. 181 Ex. 1. As for the Gindi Trust, the Debtor proposes, based on its unilateral calculation, to pay less than 56 cents on the dollar relative to the claimed amount. *Id.* at 9.

46.    Finally, the Debtor has filed a plan [Dkt. 180] (the "Plan"), but only as an afterthought. It filed the Plan on May 11, 2026, its final day to do so under section 1189 (as extended by the Court's order [Dkt. 153]). Having checked that box, however, the Debtor proceeded to file its motion to dismiss the next day, saying it hoped to "render the plan moot," Dkt. 182 (status report) at 4. Among its other deficiencies, the Plan envisions moving forward with the Debtor's proposed insider compensation scheme (including 10% of revenues to Zemel) while reserving the right to pay

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

15

creditors only from its "disposable income." Dkt. 180 at 31–32. That is, the Debtor's proposal is to pay creditors with whatever is left after the insiders have finished raiding the Debtor's coffers.[7]

## III. ARGUMENT

47.    Section 1185(a) provides that in a subchapter-V case the bankruptcy court can "order that the debtor shall not be a debtor in possession," thus empowering the subchapter-V trustee to operate the estate. The Debtor's failure of leadership and crippling insider conflicts, exemplified by its proposal to dismiss the case and imperil its creditors just to escape Court scrutiny, provides ample cause to appoint a neutral fiduciary with authority over the estate. Only such an independent third party can protect creditors and patients at this critical moment for the estate.

48.    Removal under section 1185(a) "effectively transform[s] the subchapter V trustee to an operating trustee." *In re Pittner*, 638 B.R. 255, 259 (Bankr. D. Mass. 2022). "[W]hen the debtor is removed from possession in a subchapter V case, it is clear that the trustee can exercise trustee rights and powers because the debtor, then out of possession, no longer has them." 8 Collier on Bankruptcy ¶ 1183.03 (16th ed. 2026). Upon removal of the Debtor, the Trustee would thus have the power (subject to Court approval) to, for example, assume or reject contracts under section 365, sell estate property under section 363, and pursue or settle estate causes of action, including avoidance actions. *See, e.g.*, *Green v. Nosek*, 2022 WL 16857106, at *3 (D. Minn. Nov. 10, 2022) (post-removal, subchapter-V trustee could sell property outside ordinary course); *In re Micron Devices, LLC*, 2021 WL 2021468, at *15 (Bankr. S.D. Fla. May 20, 2021) (settle estate litigation).

49.    Section 1185(a) provides that the Court "shall order" this remedy "for cause," which includes "fraud, dishonesty, incompetence, or gross mismanagement." This list is not exhaustive, and cause for removal "is determined by the best interest of creditors and the estate." *In re Pinnacle Foods of Cal. LLC*, 2025 WL 951650, at *4 (Bankr. E.D. Cal. Mar. 27, 2025).

50.    Here, cause exists for three related reasons. ***First***, the Debtor has demonstrated a pronounced lack of interest in any legitimate reorganization. Its motion to dismiss, evincing a

---

[7]    The Gindi Trust reserves the right to object to the Plan on this and/or any other bases should the Debtor notice the Plan for confirmation.

complete disregard for the interests of creditors, marks an abuse of the bankruptcy process. **Second**, the Debtor's leadership is hopelessly conflicted. Zemel, Kohn, and Schmukler are the potential targets of millions of dollars in avoidance actions—the estate's most valuable assets—which they obviously will not pursue against themselves. They also apparently will not act to avoid Schmukler's lien or disallow his claim, despite describing it as "devastating" to the estate and its creditors if the Debtor loses the Unlawful Detainer Action. **Third**, the Debtor has failed to chart a path forward to protect its patients and ensure creditors are treated equitably if it loses the unlawful detainer trial. Instead, it has chosen to ignore the inevitable and profess amnesia for the reasons it filed bankruptcy in the first place. Someone must protect the estate, including if the Debtor loses the Unlawful Detainer Action. Zemel, Kohn, and Schmukler will not be that someone.

**A.    The Debtor suffers a lack of leadership and a disregard for the bankruptcy process**

51.    This case never had any legitimate bankruptcy purpose, but rather was always a strategic ploy to game the system for the benefit of insiders. The Debtor's disinterest in reorganization has shown itself through the Debtor's insiders' failure to understand their own roles or operate a proper bankruptcy case. The Debtor has now shown its true colors by reversing course as soon as bankruptcy no longer served its insiders' purposes. This leadership vacuum must be filled by the Trustee in time to prepare for the Debtor's next steps before trial, and before the Debtor's insiders can inflict any more damage.

52.    From its inception, this case has never had a *bona fide* reorganizational purpose. Regardless of the outcome of the Unlawful Detainer Action, the Debtor never intended to reorganize. If the Debtor prevails in the Unlawful Detainer Action, it will not require bankruptcy protection because it predicts that it would have sufficient funds to pay all allowed creditors in full. *E.g.*, Plan at 22 (if Debtor can "maintain possession of the Facility" it "projects to have sufficient funds on the Effective Date to pay all Allowed Claims in full"). On the other hand, if it loses the Unlawful Detainer Action, it has admitted it cannot reorganize. *E.g.*, Dkt. 55 ¶ 13 (noting that if Gindi Trust is successful in court, "[a] successful reorganization would be impossible"). Thus,

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

17

***whether it wins or loses the unlawful detainer trial, the Debtor has never had any intention or possibility of reorganizing.***[8]

53.     This lack of interest in the bankruptcy process or estate stewardship has become apparent through a series of failures of leadership and governance.  In just over four months of bankruptcy:

- The Debtor made material errors and omissions in its disclosures that it did not correct until the Gindi Trust brought them up.  Even in its amended disclosures, *see* Dkt. 99, discrepancies remain, for example, with respect to how much and when Zemel was paid.

- The Debtor's insiders have given conflicting and confusing testimony about their roles, and—when it suited their interests in the Unlawful Detainer Action—professed ignorance under oath about the Debtor's basic governance, books and records, operations, and finances.

- Without notice to the parties or Court approval, the Debtor has apparently made postpetition payments to prepetition unsecured creditors, including the nephew of one of its insiders.

- The Debtor has apparently spent so much on efforts to sow delay and antagonize the Gindi Trust—filing an unnecessary adversary proceeding, litigating ludicrous insider compensation schemes, submitting a half-baked Plan just to check a subchapter-V box, and, now, moving to dismiss—that it complains of "exorbitant costs associated with operating and administering a chapter 11 case."  Dkt. 186.

54.     Were there any doubt about the Debtor's disinterest in using the tools of chapter 11 for a proper purpose, its motion to dismiss dispelled them.  The premise of its motion is that "no further purpose or benefit would be served by remaining in Chapter 11 or certainly not by converting the Chapter 11 case to Chapter 7."  Dkt. 181 at 12.  To begin with, the Debtor's statement that it has "no further purpose or benefit" from bankruptcy is shockingly short-sighted given that less than five months ago, it said that "[t]his bankruptcy filing was required" to forestall "the inability of the Debtor to continue to care for its patients, and the inability of the Debtor to pay its debts."  Zemel First-Day Decl. ¶ 17.  Further, if the bankruptcy is dismissed, the Debtor would no longer be able to use section 547 to avoid the obviously preferential lien claimed by Schmukler (or, for that matter, the preferential transfers to Zemel).  The Debtor's proposal in its dismissal motion to pay certain

---

[8]     For avoidance of doubt, the Gindi Trust alleges that the bankruptcy petition was filed in bad faith, providing an independent basis for removal.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

18

favored creditors in full (including the $500,000 "loan" that Kohn made to it) while leaving others (including the Gindi Trust, a tort plaintiff, wage-and-hour creditors, and certain vendors) unpaid or partially paid only highlights its disregard for its creditors.

55. The inevitable conclusion is that the Debtor has no regard for patients and creditors, but rather will advance any argument and take any step that it feels serves its insiders' strategic purposes. This is not a problem the parties can afford to defer any longer. If the Debtor loses the Unlawful Detainer Action, its insiders have demonstrated that they will not take steps to stabilize the estate but rather will attempt to turn the situation to their own advantage. Indeed, these insiders are likely to become more desperate—and more unstable—as the trial approaches. The Debtor requires competent leadership now, in advance of that crisis moment, to prepare to ensure continuity of care and protect creditors.

56. The Debtor's irregularities in disclosure, governance, and administration, on their own, were troubling enough to merit Court intervention. But the Debtor's motion to dismiss is the clearest sign yet that the Debtor's insiders have no respect for, or interest in, the bankruptcy process. At this critical moment, the estate needs a real fiduciary.

**B.    The Debtor's insiders are hopelessly conflicted**

57. The circumstances of this case and the motion to dismiss make clear that the Debtor has never been interested in reorganizing. What it **has** been interested in is an insider payment bonanza that left the Debtor cash-flow insolvent before bankruptcy and which the Debtor has sought at every turn to restart and increase. The insiders' pervasive efforts to drain the estate for their own benefit have left them with disabling conflicts and continue to threaten the estate's future.

58. Courts recognize that a conflict of interest alone is sufficient cause to remove a subchapter-V debtor in possession. *In re Pinnacle Foods*, 2025 WL 951650, at *5 ("[A] conflict of interest . . . is a cause for removal."). In fact, when a debtor in possession "would have to investigate and, if necessary, sue himself and his own entities," "this is an incurable conflict of interest" justifying removal. *In re No Rust Rebar, Inc.*, 641 B.R. 412, 425 (Bankr. S.D. Fla. 2022); *cf., e.g., In re Picacho Hills Util. Co.*, 518 B.R. 75, 82 (Bankr. D.N.M. 2014) ("A number of courts have

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

found 'cause' to convert or dismiss where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers.").

59. For example, in *In re Duling Sons, Inc.*, the subchapter-V debtor's sole shareholder caused it to take on debt prebankruptcy for his "personal benefit" and may have converted debtor assets for his own use. 650 B.R. 578, 581 (Bankr. D. S.D. 2023). Given the potential causes of action arising from this conduct, the court reasoned that he "would likely have to sue himself to fulfill his fiduciary obligations to the estate." *Id.* The court held that there was "no conceivable cure" because the shareholder "holds all corporate positions of Debtor," and ordered the debtor removed from possession. *Id.* at 582–83.

60. Here, Kohn, Zemel, and Schmukler—the only three people who appear to have any degree of authority over the Debtor and its operations—find themselves in the same position as the *Duling Sons* shareholder. All three are prime targets for avoidance actions:

- Zemel received millions from the Debtor within 90 days of the bankruptcy and has admitted the payments were made, at best, on account of antecedent debt (*i.e.*, supposed legal bills) outside the ordinary course of business; these payments are thus likely avoidable preferences and/or fraudulent transfers.

- Kohn extracted $2.6 million in distributions at a time when the Debtor faced an existential threat to its business in the form of the Unlawful Detainer Action, making him a likely subject of fraudulent transfer and/or preference claims. Indeed, Kohn appears to have conceded that he was not entitled to these payments, given that he has offered to "return" 50% which he now acknowledges should have gone to the Gindi Trust. Dkt. 181 at 30. These distributions also likely violated California law, which prohibits dividends that render a corporation unable to pay its debts. *See* Cal. Corp. Code §§ 500–501.

- Schmukler received $1.2 million in transfers within 90 days of the bankruptcy; although the Debtor claims that these were ordinary course bonus payments, Schmukler undisputedly was not entitled to any bonuses while the Gindi Trust was not receiving rent. *See* Dkt. 122 at 15.

61. It would be a dereliction of the Debtor's fiduciary duties ***not*** to investigate and pursue these outsized claims which, at a value of $6 million or more, form the estate's single largest asset pool. But none of these men can be expected to sue themselves. Nor can they, given their close personal and business ties, be expected to investigate or sue one another. Zemel cannot be expected to prosecute his father-in-law, to whom he says he owes a "great debt of gratitude." 341(a) Mtg. Tr.

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

20

(Kidder Decl. Ex. A) at 52:2–5. And Kohn cannot legitimately be left to prosecute the father of his grandchildren.

62. As for Schmukler, Zemel cannot be expected to prosecute an avoidance action against him, given that he and Schmukler are friends and are involved in other business ventures together that earn Zemel more than $4 million per year. 341(a) Mtg. Tr. (Kidder Decl. Ex. A) at 47:14–22, 53:11–17. Nor can this task devolve to Kohn. Setting aside that Kohn can hardly be impartial toward a man who earns his son-in-law $4 million a year, Schmukler has testified that he and Kohn have "a close working relationship" and have "operated on a basis of mutual trust." Kidder Decl. Ex. D ¶ 9. Consistent with these close bonds of trust and friendship, the Debtor has gratuitously sought to pay Schmukler millions he is not currently entitled to during the bankruptcy case. Dkt. 122.

63. The Debtor's conflict of interest with Schmukler is especially concerning given that he claims a $10 million lien against the estate that the Debtor says would be "effectively devastating" for its other creditors if the Debtor does not win the Unlawful Detainer Action. Dkt. 78 at 3. Early in this case, the Debtor said that it would seek to avoid Schmukler's lien as a preference under section 547, Zemel First-Day Decl. ¶ 16, yet it has not taken a single step in that direction. To the contrary, it has gone out of its way to attempt to funnel cash to Schmukler and advance arguments that could support allowance of his dubious claim.

64. Indeed, the Debtor's behavior at every step has shown that it hopes to enrich its insiders above all else. Before bankruptcy, its insiders stripped the Debtor of every penny—to the point that it could not have made payroll had Kohn not put $500,000 back into the company. At the same time, it left critical bills unpaid in order to free up cash to distribute to insiders. After bankruptcy, it sought to resume its feverish pace of insider distributions by implementing unprecedented pay packages for Kohn and Zemel—efforts that were all the more concerning given that Zemel has never been on salary and both appear to treat the Debtor, at best, as a part-time job. Now that those efforts have failed, it seeks to dismiss the case so that, outside of Court scrutiny, it can continue making these insider payments and deliver to the courthouse steps in the Unlawful Detainer Action a hollowed out shell, just as it did with this bankruptcy. In fact, it has already told

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

21

the Court that if it exits bankruptcy, it would proceed with the exorbitant insider-pay packages that it unsuccessfully introduced during this case. Plan at 31–32 (post-confirmation, Zemel and Kohn would "be entitled to receive compensation as provided in [their] insider compensation request[s]").

65. The Debtor, in short, has never cared one iota for anything other than its insiders' bank accounts. It cannot be trusted to make the hard decisions it will face if it loses the Unlawful Detainer Action or to prepare for that likely result. To the contrary, faced with that possibility, these insiders' behavior will only become more destructive and erratic. The Debtor's singular purpose of enriching its insiders has so deeply compromised its fiduciary duties that it can no longer credibly lead the estate.

**C.    The Debtor has no plan for "Day One" after the unlawful detainer trial**

66. The estate must plan to preserve continuity of care and protect patients in the event it does not succeed in the Unlawful Detainer Action. The Debtor's insiders will not do those things. The estate requires an independent fiduciary who will begin planning today for a "Day One" after the unlawful detainer trial.

67. To begin with, the estate must plan now to safeguard patients in the event that it loses the Unlawful Detainer Action and must transition the Facility to a new operator. The Gindi Trust has acted diligently and consistently to avoid displacement of any patients as a result of the Unlawful Detainer Action. But, if the state court determines that the Lease has in fact expired, the Debtor must participate in a safe and responsible transition. In fact, it has done the opposite. Its motion to dismiss evinces a desire to deprive patients of the protection and transparency that bankruptcy affords—including the services of the patient care ombudsman. The Debtor has further signaled a desire to litigate *ad infinitum* to preserve its hold on the Facility rather than cooperate with the Gindi Trust in a safe transition. This alone merits removal. *E.g.*, *In re Pinnacle Foods*, 2025 WL 951650, at *5 ("Though it may be true that the Debtors or their principal want to pursue the rights they have available, that cannot be done without consideration of the creditors' and the estates' interests. That suggests a conflict of interest which is cause for removal.").

68. As for its creditors, the Debtor admits that, if it loses the Unlawful Detainer Action without the protection of bankruptcy, its creditors would likely go unpaid. The Debtor's desire to

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

22

dismiss the case anyway suggests that it is not considering creditors' best interests or planning for how their claims can be funded in the event it cannot continue occupying the Facility.  Indeed, the Debtor filed a Plan that was based on the "fundamental assumption" that it will win the Unlawful Detainer Action, indicating that it refuses to prepare for any other result.  Plan at 20.

69.     Moreover, taking steps to protect patients and creditors should not wait until after the Debtor loses the unlawful detainer trial.  Instead, the Trustee should be empowered to take those steps *today* to ensure the estate is prepared for whatever future awaits it.  For example, the Gindi Trust's proposed order, attached as Exhibit 1, makes the removal of the Debtor conditioned on the Trustee selecting a manager with credentials and experience acceptable to the California Department of Public Health.  The Trustee should be authorized to begin this selection process *before* the Debtor faces a crisis in the form of an unfavorable verdict in the Unlawful Detainer Action.  Given that the Debtor refuses to prepare for a safe transition in the event of an unfavorable verdict—or to take any steps that do not benefit its insiders—waiting until that moment arrives would be too late.  By contrast, acting now would reduce the risk of any disruption to the Debtor's patients.

70.     In short, the uncertainty that faces the Debtor at this moment requires that whoever is in charge of the estate be prepared to:

- Preserve and protect the cash reserves the Debtor has built up during the case for the equitable, *pro rata* payment of creditors;

- Cooperate in a safe and responsible transition of operations to a replacement operator;

- Pursue Kohn, Zemel, and Schmukler for the millions of dollars in avoidable transfers the Debtor made to them;

- Litigate to avoid the Schmukler lien and disallow his claim, which threatens creditor recoveries; and

- Continue abiding by the scrutiny and rigor that bankruptcy provides.

71.     The Debtor will not do any of these things.  Instead, if Debtor's insiders are left in charge, history shows that they will:

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

- Seek any opportunity to distribute the Debtor's cash-on-hand to themselves, as they did prebankruptcy and propose to do post-bankruptcy;

- Refuse to pursue any recovery of funds from the Debtor's principals or litigate the validity of the Schmukler claim and lien;

- Continue to advocate for their own best interests; and

- Act with increasing urgency to shore up their position to the detriment of creditors in advance of trial in the Unlawful Detainer Action.

72.    If the Court needed further proof that the Debtor's insiders cannot be trusted, recent history supplies it.  The difference that Court oversight has made for this Debtor is unmistakable. In the months before bankruptcy, the Debtor's insiders drained it of cash until it could no longer pay its operating costs and crashed into bankruptcy with less than $4,000 in the bank, all while saddling it with unprecedented bills.  In the months since bankruptcy, the Debtor has apparently managed to pay its ongoing costs (other than for use and occupancy of the Facility) and has accumulated nearly $4,000,000 in cash.  The fact that the Debtor's insiders now seek to escape this oversight speaks to their intent to return the estate to its prebankruptcy past—*i.e.*, to continue looting the Debtor's business and saddling it with debt pending trial.

73.    The Debtor's insiders are not responsible, reliable, or credible actors.  The motion to dismiss has made clear, if ever there were any doubt, that they have no interest in protecting the estate; their sole and overriding mission is to enrich themselves at all costs.  This self-seeking behavior will only intensify as the Debtor approaches a crisis point—the moment when the estate most needs a reliable steward.  Subchapter V provides a remedy for precisely this situation.  The Court should make use of this option and remove the Debtor as debtor in possession.

## IV.  CONCLUSION

74.    The Debtor's supposed stewardship of the estate has run its course.  The Debtor's principals have proven themselves to be not independent and responsible fiduciaries, but self-interested actors who hollowed out the estate in the run-up to bankruptcy and have attempted, unsuccessfully, to do the same postpetition.  They have not, up to this point, demonstrated the slightest interest in protecting creditors.  And the Debtor's motion to dismiss effectively disclaims any plans to do so in the future.

24

75. The Bankruptcy Code makes the administration of a chapter 11 debtor's estate a privilege, not a right. The Debtor has demonstrated that it cannot be trusted with that privilege. The only responsible option for the estate now is the stewardship of a neutral third-party who can act in the best interests of patients and creditors in advance of a critical moment for the estate.

76. Accordingly, the Gindi Trust respectfully requests that the Court enter an order, substantially in the form of the proposed order attached hereto as **Exhibit 1**, removing the Debtor as debtor in possession under Bankruptcy Code section 1185(a), empowering the Trustee to operate the estate, authorizing and directing the Trustee to select a manager for the Debtor's skilled nursing facility business acceptable to the California Department of Public Health, and granting such other and further relief as the Court deems just and proper.

May 19, 2026                    KTBS LAW LLP

                                _____*/s/ Samuel M. Kidder*_____
                                Michael L. Tuchin (State Bar No. 150375)
                                Samuel M. Kidder (State Bar No. 284015)
                                Eitan Arom (State Bar No. 342703)

                                *Counsel for Rachel Gindi as Trustee of the JRG Trust # 219*

KTBS LAW LLP
1801 CENTURY PARK EAST, TWENTY-SIXTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

25

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 1801 Century Park East, Twenty-Sixth Floor, Los Angeles, CA 90067.

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF MOTION AND MOTION FOR REMOVAL OF THE DEBTOR IN POSSESSION UNDER 11 U.S.C. § 1185; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) May 19, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

SEE ATTACHMENT

☒ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On May 19, 2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SEE ATTACHMENT

☒ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 19, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

PERSONAL DELIVERY VIA MESSENGER
The Honorable Barry Russell
U.S. Bankruptcy Court
Roybal Federal Building
Bin outside of Suite 1660
255 E. Temple Street
Los Angeles, CA 90012

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 19, 2026 | Shanda D. Pearson | */s/ Shanda D. Pearson* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1193015.6

**ADDITIONAL SERVICE INFORMATION (if needed):**

**1.** **SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

**COUNSEL FOR DEBTOR**
- **Ron Bender** rb@lnbyg.com
- **Krikor J Meshefejian** kjm@lnbyg.com
- **Monica Y Kim** myk@lnbyg.com, myk@ecf.inforuptcy.com
- **Beth Ann R. Young** bry@lnbyg.com, bry@lnbyb.com
- **Gary F Torrell** gtorrell@hooperlundy.com

**COUNSEL FOR UNITED STATES TRUSTEE**
- **Ron Maroko** ron.maroko@usdoj.gov
- **United States Trustee (LA)** ustpregion16.la.ecf@usdoj.gov

**COUNSEL FOR SUBCHAPTER-V TRUSTEE**
- **Gregory Kent Jones (TR)** gjones@sycr.com; smjohnson@sycr.com; C191@ecfcbis.com; cpesis@stradlinglaw.com

**ADDITIONAL PARTIES AND COUNSEL**
- **Leslie A. Cohen** leslie@lesliecohenlaw.com
- **Samuel M. Kidder** skidder@ktbslaw.com
- **Robert J. Pfister** rpfister@pslawllp.com
- **Matthew J Stockl** mstockl@otterbourg.com, nregina@otterbourg.com
- **Tamar Terzian** tamar@terzlaw.com, tkouyoum@gmail.com

**2.** **SERVED BY U.S. MAIL**

Trustee
Gregory Kent Jones (TR)
Stradling Yocca Carlson & Rauth
10100 N. Santa Monica Blvd., Ste. 1400
Los Angeles, CA  90067

U.S. Trustee
Ron Maroko
915 Wilshire Blvd., Ste 1850
Los Angeles, CA 90017

Care for the Elderly, Inc.
2312 W. 8th Street
Los Angeles, CA 90057

Ron Bender
Levene Neale Bender Yoo & Golubchik
2818 La Cienega Ave
Los Angeles, CA 90034-2618

Patient Care Ombudsman
Tamar Terzian
Terzian Law Group
1122 E. Green Street
Pasadena, CA 91106-2500

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.